UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-107 (PJS/DJF) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Issac Oneal Maiden, | |
| Defendant. | |

This matter is before the Court on Defendant Issac Oneal Maiden's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Searches (ECF No. 17) ("Motion to Suppress"). Mr. Maiden argues officers unlawfully searched a rental car he was driving, though the agreement had expired four hours prior to his interaction with the police, he was not listed as an authorized driver of the rental vehicle, and he proffered no evidence that he received permission to drive the vehicle. Mr. Maiden does not bear his burden to establish that he had a reasonable expectation of privacy in the rental vehicle, and even if he did, he relinquished that expectation when he fled from the vehicle, leaving the door open and the key inside the vehicle. The Court recommends denying the Motion to Suppress on these grounds.

**I.   Background**

During the afternoon of August 2, 2022, Minnesota State Trooper Anthony Nelson was patrolling I-94 East near John Ireland Boulevard in the left lane when he noticed a black Nissan driving on the shoulder of the highway coming up behind him (ECF No. 32 at 7–8). The Nissan passed Trooper Nelson on the shoulder, turned its left turn signal on, moved abruptly into the

1

center lane, cutting off a semi and another vehicle in the process, and then moved again quickly into the left lane. (*Id.* at 8–9.)

Trooper Nelson maneuvered into the left lane to get behind the Nissan and turned on his emergency lights to initiate a stop, but this had no effect of the vehicle, so he turned on his siren. (*Id.* at 9.)  The Nissan responded by activating its turn signal and moving into the center lane, leading Trooper Nelson to believe it was in the process of pulling over. (*Id.* at 9.)  Instead, the Nissan abruptly moved back into the left lane and started to pass cars and accelerate, driving on the left shoulder to avoid the congested traffic. (*Id.*; *see also* Gov. Ex. 1.)  Trooper Nelson estimated the Nissan was driving 90 miles per hour as it accelerated into the I-35 East/I-94 junction in downtown St. Paul, changing lanes and erratically passing cars. (*Id.* at 10–11.)  Due to the high volume of traffic and the Nissan's erratic driving behavior, Trooper Nelson abandoned the pursuit. (*Id.* at 11.)

Trooper Nelson notified dispatch he had been in pursuit of a black Nissan, however, and dispatch eventually informed him it picked up the vehicle on camera, which showed the vehicle took an exit ramp onto Maryland Avenue and went south onto Westminster. (*Id.* at 11–12.)  Trooper Nelson drove in that direction, and looking down the first alley south of Maryland Avenue, he saw a black Nissan with the same license plate number backing into a parking space in the back alley. (*Id.* at 12–15; *see also* Gov. Ex. 2.)  When Trooper Nelson pulled his squad car up to the Nissan, he noticed an individual in the front driver's seat of the vehicle with the door open who was beginning to exit the vehicle. (ECF No. 32 at 16–17.)  Trooper Nelson exited his squad car and gave a verbal command for the driver to get out of the car with his hands up, but the driver continued exiting the vehicle and fled on foot through the backyard of the house where the car was parked, leaving the door open and the key fob inside the car. (*Id.* at 30, 32, 36; Gov. Ex. 4.)

Trooper Nelson gave chase and called dispatch for assistance (ECF No. 32 at 20). He lost sight of the suspect after chasing him through several people's yards and across traffic (*id.* at 21), but later heard over the radio that another trooper had located the suspect near a gas station and had him stopped at gunpoint. Trooper Nelson arrived at the scene and identified the suspect as the individual who had fled in the vehicle, and the officers arrested him. (*Id.* at 22; *see also* Gov. Ex. 5.) The officers later identified the suspect as Mr. Maiden. (*Id.* at 22.)

Trooper Nelson conducted a search incident to arrest of Mr. Maiden, feeling two large bulky objects in his jean pockets. (*Id.* at 23.) The first was a Ziploc bag containing two individual plastic containers containing a white powdery substance. (*Id*.) The second was another Ziploc bag containing several blue pills with 'M30' markings on them. (*Id.*) Trooper Nelson also found a large amount of cash in Mr. Maiden's pocket. (*Id.*) Trooper Nelson testified that, in his experience, the white powder was consistent with cocaine, and the blue pills were consistent with oxycodone or fake oxycodone, which is actually fentanyl. (*Id.* at 24, 29.) He further testified that, in his experience, the narcotics were packaged to sell. (*Id* at 28.)

After sealing the narcotics in evidence bags, Trooper Nelson returned to the residence where the Nissan was parked near his squad car. (*Id.* at 29.) There, he learned from St. Paul Police officers that the residents of the home where Mr. Maiden had parked claimed they had no affiliation with him. (*Id.* at 29–30.) Based on that information, Trooper Nelson understood Mr. Maiden's car was parked illegally and that Mr. Maiden had trespassed on the property. (*Id.* at 30.) Trooper Nelson called for a tow truck and immediately began a preliminary inventory search of the vehicle. (*Id.* at 30-31.) He found a large bundle of cash in plain sight, but he did not notice anything else of significance. (*Id.*) One of the things he was looking for during the search was a firearm, but he did not find one at that time. (*Id.* at 30-31, 40.)

3

The vehicle was eventually towed from the scene to the State Patrol's East Metro District Office. (*Id.* at 31–32.)  Trooper Nelson testified he ordered the vehicle towed based on Minnesota State Patrol policy, which provides that any time a vehicle flees from the State Troopers it will be towed and held for possible forfeiture.  (*Id.* at 32; *see also* Gov. Ex. 7.)  Trooper Nelson described the East Metro District lot as open, with no secured fences or gates, and testified that it is generally open to the public. (ECF No. 32 at 33.)  He acknowledged there have been instances when towed cars have been accessed or removed by unauthorized individuals. (*Id.* at 33–34.)  Trooper Nelson later received notice from another trooper, Ryan Sunderland, that the tow truck driver had found a gun on the driver's side floorboard. (*See Id.* at 44.)  Trooper Sunderland responded to the call from the tow truck driver. (*Id.* at 47.) He approached the car and could see the firearm in plain view on the driver's side floorboard of the Nissan, near the brake pedal.  (*Id.* at 48, 59; *see also* Gov. Ex. 8; Def. Ex. 1.)  When Trooper Sunderland retrieved the weapon, he determined it was outfitted with a 'switch', which converted the gun from semi-automatic to fully automatic firing. (*Id.* at 51–52.)  A round of ammunition was in the chamber, making it actively ready to be used. (*Id.* at 52.)

ATF task force member and St. Paul Police sergeant Tim Moore was one of the investigators working on this matter. (*Id.* at 60–61.)  During his investigation, he obtained the rental agreement for the Nissan from its owner, the Enterprise Leasing Company ("Enterprise"). (*See id.* at 62.)  The rental agreement listed only one authorized driver, the mother of one of Mr. Maiden's children.  The term of the agreement ended at 10:30 a.m. on August 2, 2022—roughly four hours before Trooper Nelson first encountered the vehicle. (*See id.* at 62–63; *see also* Gov. Ex. 9.) Sergeant Moore spoke to a security representative from Enterprise who described the company's protocols when a vehicle is returned to them from police custody. (*Id.* at 63.)  The representative explained each returned vehicle goes through a thorough cleaning and a

4

comprehensive safety check, which includes a search of the vehicle's interior for contraband such as narcotics and weapons. (*Id.* at 64.) Sergeant Moore testified he was aware of instances when Enterprise employees found narcotics and weapons in vehicles returned from law enforcement custody. (*Id.* at 65.)

**II.    Legal Standard**

Before challenge the legality of a search, the movant must establish he has "a reasonable expectation of privacy" in the location searched. *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015). If the movant makes such a showing, a "warrantless search is presumptively unreasonable absent some exception to the warrant requirement." *United States v. Ringland*, 966 F.3d 731, 735 (8th Cir. 2020) (quotation omitted). Because police lacked a warrant to search Mr. Maiden's vehicle, the Government would bear the burden of establishing an applicable exception to the warrant requirement if Mr. Maiden established a reasonable expectation of privacy in the car. *See United States v. Golden*, 418 F. Supp. 3d 416, 418 (D. Minn. 2019) (citing *Beck v. Ohio*, 379 U.S. 89, 97 (1964)) "The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011).

**III.   Analysis**

Mr. Maiden challenges the warrantless searches of the rental car and seeks to suppress all evidence obtained in connection with the searches, including the gun. The Government raises several arguments in response: (1) Mr. Maiden did not have a reasonable expectation of privacy in the vehicle because the rental agreement had expired, and he was not authorized to drive it in any event; (2) Mr. Maiden abandoned the vehicle by fleeing from it on foot, leaving the door open and the keys in the vehicle in a stranger's driveway, thus extinguishing any expectation of privacy

he might have had; and (3) the "automobile exception" to the warrant requirement applied because police had probable cause to search the vehicle based on the tow truck driver's tip, and because the gun was in plain view. The Court agrees and recommends denying Mr. Maiden's Motion to Suppress on each of these grounds.

To have a reasonable expectation of privacy in property and claim the protections of the Fourth Amendment, a party "need not always have a common-law property interest in the place searched[.]" *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) (citations omitted). There is no single metric or exhaustive list to make this determination, courts instead must do so "by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* (quoting *Rakas et al. v. Illinois*, 439 U.S. 128, 144 n.2 (1978)). It is the movant's burden to "present evidence of lawful possession." *United States v. White*, 962 F.3d 1052, 1054 (8th Cir. 2020) (citing *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam)). In the context of a rented vehicle, when the movant is not listed as a driver on the rental agreement, he must "present … evidence that he had been granted permission to drive the vehicle to establish lawful possession of the vehicle." *Id.* (cleaned up). "No evidence means no standing[]" to assert the Fourth Amendment's protections. *Id.*

The Government has proffered evidence establishing Mr. Maiden was not listed as an authorized driver on the rental agreement and that the agreement had expired by the time Trooper Nelson first made contact with Mr. Maiden (*see* Gov. Ex. 9). Mr. Maiden has proffered no evidence at all establishing he had permission to drive the rental car. As there is no evidence before the Court establishing Mr. Maiden had permission to drive the vehicle, the Court concludes he has not met his burden to prove he had a reasonable expectation of privacy for purposes of the Fourth Amendment. *White*, 962 F.3d at 1054–55 (no reasonable expectation of privacy under the

Fourth Amendment when driver's name did not appear on car rental agreement and he proffered no other evidence establishing authorization to drive it); *United States v. Russell*, 847 F.3d 616, 619 (8th Cir. 2017) (no reasonable expectation of privacy in rental vehicle when driver failed to show lessee had permitted him to drive or possess it).

Moreover, any privacy interest Mr. Maiden claims to have had in the vehicle surely was extinguished when he abandoned it in a stranger's driveway, leaving the door open and the key fob inside. "It is well-established that a defendant does not have a reasonable expectation of privacy in abandoned property." *United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018) (citation omitted). A "warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the search is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997). Though whether an abandonment took place is a totality of the circumstances inquiry, "two important factors [are] denial of ownership and physical relinquishment of the property." *Id.* (internal quotations and citations omitted). When conducting this inquiry, courts only consider "the objective facts available to the investigating officers, not … the owner's subjective intent." *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (per curiam) (internal quotation marks omitted).

The Eighth Circuit has repeatedly held that an individual who flees the police and abandons an unlocked vehicle to continue fleeing on foot loses any expectation of privacy in the vehicle under the Fourth Amendment. *E.g.*, *United States v. Smith*, 648 F.3d 654, 660 (8th Cir. 2011) (finding driver abandoned unlocked vehicle after officers stopped him and he ran into an open field); *United States v. Walton*, 536 F.2d 1348, 1351, 1354 (8th Cir. 1976) (finding bank robber who left vehicle on a public street with doors unlocked and window down as he fled police did not retain a reasonable expectation of privacy in the vehicle). The Eighth Circuit has also held that, to

7

"have a legitimate expectation of privacy by way of a possessory interest, [a] defendant must have possession of the vehicle and the keys." *United States v. Russell*, 847 F.3d 616, 619 (8th Cir. 2017) (quoting *United States v. Macklin*, 902 F.2d 1320, 1330 (8th Cir. 1990)).

Like the defendants in *Smith* and *Walton*, Mr. Maiden fled from his unlocked vehicle to evade police capture. And like the defendant in *Smith*, Mr. Maiden left his keys in the car and the door open. *See Smith*, 648 F.3d at 660; *see also Russell*, 847 F.3d at 619. Moreover, Mr. Maiden left the vehicle on private property, on which he appeared to have been trespassing. (*See* ECF No. 32 at 30.) Mr. Maiden thus relinquished any expectation of privacy he may have had. Having failed to establish a reasonable expectation of privacy in the rented car, Mr. Maiden cannot challenge the search. *See White*, 962 F.3d at 1055.

Finally, the Court finds Trooper Sunderland had probable cause to search the car after it was towed under the automobile exception. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982). Such probable cause was established, first, when the tow truck driver—a known informant—informed police he had seen a gun in the car; and second, when Officer Sunderland approached the car and saw the gun in plain view. For all of these reasons, the Court finds the search was reasonable and compliant with the Fourth Amendment.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Mr. Maiden's Motion to Suppress any Evidence Obtained as a Result of Any Illegal Searches (ECF No. [17]) be **DENIED**.

Dated: September 5, 2023        *s/ Dulce J. Foster*
                                              Dulce J. Foster
                                              United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).